Robert Tauler, Esq.  (SBN 241964)
rtauler@taulersmith.com
J. Evan Shapiro, Esq. (SBN 218481)
eshapiro@taulersmith.com
TAULER SMITH LLP
626 Wilshire Boulevard, Suite 550
Los Angeles, California 90017
Tel: (213) 927-9270

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BENJAMIN HECHT, individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>     vs.<br><br>ACCESS INTELLIGENCE, LLC, a Maryland limited liability company; and DOES 1 through 25, inclusive,<br><br>          Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**1. VIOLATIONS OF THE CALIFORNIA TRAP AND TRACE LAW (CAL. PENAL CODE § 638.51)** |

COMPLAINT

## JURISDICTION

1.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class.  Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen of a different State or subject of a foreign state.

2.    This Court has personal jurisdiction over Defendant because, on information and belief, Defendant has purposefully directed its activities to the Central District of California by regularly and knowingly engaging with individuals in California through use of its website to conduct financially beneficial commercial surveillance on them. Defendant's illegal conduct is directed at and harms California residents, including Plaintiff, and others in California, and if not for Defendant's contact with the forum, Plaintiff would not have suffered harm.

3.    Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; (3) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District; and (4) the injury to Plaintiff occurred within this District.

## PARTIES

4.    Plaintiff Benjamin Hecht ("Plaintiff") is, and at all times relevant to this complaint has been, a citizen of California residing and located within the Central District of California.

5.    Defendant Access Intelligence, LLC ("Defendant"  or "Access Intelligence") is a Maryland limited liability company that owns, operates, and/or

controls www.satshow.com ("Website"), an online platform that offers information about SATShow Week, a space and satellite industry convention.

6.  The above-named Defendant, along with its affiliates and agents, are collectively referred to as "Defendants." The true names and capacities of the Defendants sued herein as DOE DEFENDANTS 1 through 25, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein. Plaintiff will seek leave of Court to amend the Complaint to reflect the true names and capacities of the DOE Defendants when such identities become known.

7.  Plaintiff is informed and believes that at all relevant times, every Defendant was acting as an agent and/or employee of each of the other Defendants and was acting within the course and scope of said agency and/or employment with the full knowledge and consent of each of the other Defendants, and that each of the acts and/or omissions complained of herein was ratified by each of the other Defendants.

## FACTUAL ALLEGATIONS

8.  Access Intelligence is the proprietor of www.satshow.com, a website that offers information about SATShow Week, a space and satellite industry convention.

9.  Defendant has partnered with registered California Data Brokers in order to deanonymize and develop clandestine user profiles on otherwise anonymous website visitors (the "Data Brokers," and each a "Data Broker"). Defendant has done this by installing Data Broker Software Development Kits ("DBSDKs") on its website.

10.  DBSDKs are designed to track and correlate visitors by capturing electronic impulses designed to identify them. This is accomplished through "browser fingerprinting," a process by which Data Brokers are able to ascertain the

identity of a website visitor by plotting hundreds of personal identifiers, including a user's geolocation, device information, identification and cross-referencing of malicious cookies installed on their devices, and other traits evident from a user's browser.

### Registered California Data Brokers

11. Data Brokers are companies whose core business is to collect, aggregate, analyze, and sell or license personal and non-personal data about individuals and organizations. Data Brokers operate largely behind the scenes, often without direct interaction with the individuals whose data they monetize.

12. Data Brokers gather information from a wide variety of sources, including:

a. Public Records: Court records, property records, marriage licenses, voter registration rolls.

b. Commercial Sources: Retailers, financial institutions, online marketplaces, subscription services, and loyalty programs.

c. Web Activity and Cookies: Tracking users via cookies, pixels, and device fingerprinting across websites and apps.

d. Social Media and Online Platforms: Scraping public profiles and aggregating behavioral data.

e. Mobile Apps: Many apps transmit user data (e.g., location, contacts, usage) back to data brokers, either directly or via third-party Software Development Kits.

f. Third-party Agreements: Some companies directly sell or share user data with data brokers under contractual arrangements.

13. Once the data is collected it is consolidated and organized into comprehensive profiles that may include thousands of attributes per individual. The data is then cross-referenced and linked using unique identifiers like device IDs and cookies to unify data about individual users from multiple sources. Data

COMPLAINT

3

Brokers then use algorithms and analytics to infer additional characteristics — e.g., estimating income, marital status, interests, or likelihood of pregnancy — based on patterns in the raw data.

14.   Data Brokers are accumulating data and profiling individuals to an alarming extent.  As the CEO of a Data Broker recently described the extent of their surveillance abilities as to an otherwise anonymous individual:  "We know who she is, what she watches, what she reads, and who she lives with.  [We] also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys.  We know that [she] has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that [her] income has not been keeping pace with inflation."[1]

15.   Given the amount of data available by way of the Data Brokers' practices, a company like Defendant has an incentive to partner with a Data Broker so that it can learn the identity of their website visitors in order to allocate marketing resources, including phone calls, mailings, social media advertisements, and emails, to likely customers, for its financial benefit.

16.   Defendant has in fact partnered with the Data Brokers mentioned herein, by installing software on Defendant's website in order to deanonymize, identify and target prospective customers, while allowing Data Brokers to access, use, and monetize the data provided by Defendant, in manners that are never shared with anyone outside of their organization who does not purchase it.

---

[1] Lucas Ropek, Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users, March 15 2025 (Gizmodo.com).

COMPLAINT

4

**The DBSDKs are a Trap and Trace Device**

17.    DBSDKs gather device and browser information, geographic information (including the state and/or city from which a device accesses a website), referral tracking, and URL tracking by running code or "scripts" on the Website to send user details to a Data Broker.

18.    The DBSDKs have begun to collect information by the moment a user lands on the Website, before they have had any opportunity to consent.

19.    The DBSDKs runs on virtually every page of Defendant's website, sending to the Subject Data Brokers tracking information to financially benefit both Defendant and the Data Brokers.

20.    CIPA defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."   Cal. Penal Code § 638.50(c).

21.    The DBSDKs are a process to identify the source of electronic communication by capturing electronic impulses sent out from users' devices and identifying dialing, routing, addressing, and signaling information about or generated by users. The users are never informed that the Website is collaborating with Registered California Data Brokers to obtain their phone numbers and other identifying information.

22.    The DBSDKs are "reasonably likely" to identify the source of electronic impulses sent from devices visiting the Website.   In fact, they are designed solely to meet this objective.

23.    Defendant did not obtain a court order before installing the DBSDKs on its Website.

24.    Defendant did not obtain the express or implied consent of  Plaintiff or any of the members of the proposed Class to be subjected to data sharing with

Registered California Data Brokers for the purposes of de-anonymization, profiling, and targeting.

25. Defendant is statutorily ineligible to assert consent as a defense to its illegal use of a Trap and Trace device. Under Penal Code § 638.51(b), a consent defense is only available to a "provider of electronic or wire communication service," which Defendant is not.

26. The California Invasion of Privacy Act ("CIPA"), California Penal Code § 630 *et. seq.*, imposes civil liability and provides for statutory damages for the installation of trap and trace software without a court order. *Id.* §§ 637.2, 638.51; *see Moody v. C2 Educ. Sys. Inc.*, No. 2:24-CV-04249-RGK-SK, 2024 WL 3561367 (C.D. Cal. July 25, 2024) (holding that Data Broker Software was properly alleged to be a trap and trace device because it communicates over the internet and the statutory definition of a trap and trace device expressly covers "wire communication" and "electronic communication," and is not limited to telephone lines).

### Defendant and the California Data Brokers

27. Defendant's installation of the DBSDK's violates the California Trap and Trace law.

28. Specifically, Defendant has installed the SDK of LiveRamp, NextRoll (AdRoll), Outbrain, and Comscore on www.satshow.com.

29. The LiveRamp, NextRoll (AdRoll), Outbrain, and Comscore function as follows:

### LiveRamp

30. LiveRamp is one of the largest data brokers in California, specializing in deanonymization of website users. The LIVERAMP DBSDK tracks online signals from a website visit and matches it with their vast database to create a universal serial number for a person called a "RampID." The LIVERAMP DBSDK functions as follows:

31.    First, when the LIVERAMP DBSDK loads on a webpage, it immediately captures the user's identifiers present in that context – e.g. reading any first-party cookie ID or a platform's ID that the page passes, as well as standard header info like IP and user-agent.

32.    Second, the data obtained by the LIVERAMP DBSDK is sent to LiveRamp's servers where Liveramp combines the data obtained from a visit to Defendant's website with other data it has obtained about the individual both online and offline.    This data includes name and postal address, email address, cookie IDs, and mobile device IDs.

33.    Third, through this process, the user is matched with their pre-existing "RampID" (data broker serial number).    LiveRamp's RampID is permanent, and designed to persistently track an individual across thousands of websites. RampIDs do not change with clearing cookies or switching devices.    The RampID, and the data associated with it, is widely shared with dozens of ad tech partners so that all parties who pay for it can identify the user, and see the user's online habits.

### Nextroll (Adroll)

34.    NextRoll, Inc. (formerly known as AdRoll, Inc.) is a marketing technology company specializing in retargeting and targeted advertising services. NextRoll appears on the California Data Broker Registry, indicating it trades in the personal data it collects (for example, by assembling audience segments or profiles that are used in advertising). NextRoll's services reach across a vast network of websites and advertising exchanges, and the company openly touts its ability to recognize users across different sites and even across devices for marketing purposes.

35.    The NEXTROLL DBSDK is a snippet of JavaScript that website owners embed in their site's HTML, typically in the header. Once installed, the pixel tracks essentially every action a visitor takes on the site. NextRoll's own help

center describes the AdRoll Pixel as code that "tracks everything your visitors are doing on your site" The NEXTROLL DBSDK functions as follows:

36.    First, when a user loads a page, the NEXTROLL DBSDK executes and sends an HTTP request to NextRoll's servers, including various pieces of information about the visitor's session. According to NextRoll's documentation, the NEXTROLL DBSDK collects HTTP header data – this includes the user's IP address, their browser user agent (which reveals browser version and operating system), the referrer URL (i.e. where they came from), and the current page URL. In addition, the NEXTROLL DBSDK captures site-specific data: it attaches an "advertisable ID" and "pixel ID" to identify the website/ad account in NextRoll's system (so NextRoll knows which client's site the data came from). It then records user actions on the page (what NextRoll calls "Site Activity") such as page views, clicks on certain elements, form submissions, items added to cart, and other conversion events.

37.    Second, NextRoll then assigns each browser a "User identifier" the first time the AdRoll pixel sees that browser.  This is a persistent cookie stored in the user's browser (often named something like "adroll" or "nextroll" cookie) that allows NextRoll to recognize the same user on subsequent visits or on other websites that also have AdRoll tracking.  NextRoll's ID cookie means the tracking persists beyond the single site. If another unrelated website also uses AdRoll, that same cookie ID will be recognized and the user's new visit will again be captured and associated with their existing profile.

38.    Third, Nextroll  platform performs "cookie matching," meaning it will compare its own user identifier with identifiers used by other ad platforms in order to broaden the reach of tracking and ad delivery.  For example, if NextRoll's pixel finds a user, NextRoll can later synchronize that user's ID with, say, a Facebook or Google cookie to continue tracking user activity across the internet, storing all of the information in each discrete user profile.

COMPLAINT

8

**Outbrain**

39.    Outbrain is a content recommendation platform, advertising network and personalization engine for content. Outbrain is registered as a data broker in California.

40.    The OUTBRAIN DBSDK functions as follows:

41.    First, when a page loads, the OUTBRAIN DBSDK captures the user's IP address and translates that IP into a general geolocation (city/region). It also notes the device type, browser type, operating system, and referring URLs. All of this happens via the web requests the browser makes to Outbrain's domain to fetch content or ping for tracking.

42.    Second, the OUTBRAIN DBSDK will drop a cookie on the user's browser (if not already present) to assign a Unique User ID (UUID). This UUID is an identifier that Outbrain uses to keep track of that user on any Outbrain-enabled site. Outbrain's systems catalogue and analyze the content you consume across partner sites associated with that UUID.

43.    Third, the OUTBRAIN DBSD logs information about the user's interaction with the page and stores it in order to accumulate a browsing profile about a user without their consent.

**Comscore**

44.    Comscore is a data broker that monitors individual users across sites via unique IDs and captures their real-time browsing metadata (IP, pages, timestamps) for analysis.

45.    The COMSCORE DBSDK functions as follows:

46.    First, when a user visits a tagged site, the COMSCORE DBSDK triggers an HTTP request to Comscore's servers. This request transmits identifying signals in real time – including the user's IP address, a timestamp, and browser type.

COMPLAINT

9

47.    Second, the COMSCORE DBSDK sets a unique cookie in the user's browser upon first contact, which enables recognizing that browser on subsequent sites. This allows Comscore to "observe 'browser-level' behavior, i.e. how often you return to a website or if, having visited one website, you go to another related one."

48.    Third, the COMSCORE DBSDK intercepts the user's web request and logs it to a third-party server along with persistent identifiers. The data collected (page URLs, titles, visit times, IP, etc.) is used to build user profiles and deduplicate audiences across different websites.  In other words, gathered data is correlated with demographic or personal information in Comscore's panel, which Comcore can then sell.

49.    The COMSCORE DBSDK thus facilitates continuous, cross-site tracking of users via a unique ID tied to their device.

**Plaintiff**

50.    Plaintiff visited www.satshow.com on June 10, 2025.  When Plaintiff did so, their identifying information by way of electronic impulses was sent to LiveRamp, NextRoll (AdRoll), Outbrain, and Comscore.  The purpose of this transfer of data from Defendant to the Data Brokers was for de-anonymization, profiling, and targeting.  The transfer benefitted both the Defendant and the Data Broker financially.

51.    On information and belief, Data Brokers took Plaintiff's information and added it to their profiles of Plaintiff.  In turn, Defendant received other relevant data obtained by the Data Brokers regarding Plaintiff.  The Data Brokers could then use data regarding Plaintiff's visit to further profile Plaintiff, with the objective of monetizing this data by selling or licensing it to other entities, including law enforcement.  In this regard, a recent report by the Brennan Center, a public policy nonprofit, has explained that "government agencies may purchase

personal data to further their exercise of coercive powers, including the ability to deport, arrest, incarcerate, or even use lethal force." [2]

52.    There is no way for Plaintiff to learn what the Data Brokers did with Plaintiff's data, including what inferences the Data Brokers have gleaned from it, or when, why and to whom the Data Brokers have sold or licensed Plaintiff's data. As such, Plaintiff has been injured by Defendant's surveillance practices.

53.    Plaintiff was never informed of, and therefore could not have consented to, data collection by the Data Brokers for mercantile purposes.  Plaintiff has no way to know the scope of the injury suffered because the Data Brokers operate in secret and without public disclosure of their operations.

## CLASS ALLEGATIONS

54.    Plaintiff brings this action individually and on behalf of all others similarly situation (the "Class") defined as follows:

> **All persons within California whose identifying information was sent to a Data Broker as a result of visiting the Website within the limitations period.**

55.    NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

56.    COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to

---

[2] https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole

COMPLAINT

11

the individual circumstances of any Class Member, include but are not limited to the following:

   a.  Whether a DBSDK is a trap and trace process as defined by California law;

   b.  Whether Plaintiff and Class Members are entitled to statutory damages;

   c.  Whether Class Members are entitled to injunctive relief; and

   d.  Whether Class Members are entitled to disgorgement of unlawfully obtained data.

57.   TYPICALITY: As a person who visited Defendant's Website and whose personal information was fingerprinted and de-anonymized by a Data Broker, Plaintiff is asserting claims that are typical of the Class.

58.   ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of The Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

59.   SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class Member is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed and address identical issues.

## FIRST CAUSE OF ACTION

**Violations of California Trap and Trace Law**

**Cal. Penal Code § 638.51 (the "California Trap and Trace Law")**

60.   Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

COMPLAINT

61. The California Trap and Trace Law provides that "a person may not install or use…a trap and trace device without first obtaining a court order…." Cal. Penal Code § 638.51(a).

62. A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." *Id.* § 638.50(c).

63. Defendant uses a trap and trace process by deploying the DBSDKs on its Website because the DBSDKs are designed to capture signaling information of Website visitors. As such, the DBSDKs is designed precisely to identify the source of the electronic and wire communications sent from the devices of users in California visiting the Website in violation of the California Trap and Trace Law.

64. Defendant did not obtain a court order before installing the DBSDKs on the Website. Defendant also did not obtain consent from Plaintiff or any of the Class Members before using trap and trace technology to identify visitors to its Website.

65. CIPA imposes civil liability including statutory damages for violations of the California Trap and Trace Law. Cal. Penal Code § 637.2; *see also C2 Educ. Sys. Inc.*, 2024 WL 3561367.

## **PRAYER**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1. An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class Counsel;

2. An order that data unlawfully obtained be disgorged;

3. An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

4. Statutory damages pursuant to CIPA;

COMPLAINT

13

5.    Reasonable attorneys' fees and costs; and

6.    All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

DATED: August 14, 2025                    TAULER SMITH LLP

                                   By:    */s/ Robert Tauler*
                                          Robert Tauler, Esq.
                                          *Attorney for Plaintiff*

COMPLAINT

14

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.


DATED: August 14, 2025                    TAULER SMITH LLP

                              By:    */s/ Robert Tauler*
                                     Robert Tauler, Esq.
                                     *Attorney for Plaintiff*

COMPLAINT

15